# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 12, 2011

## STATE OF TENNESSEE v. CARL LEE HOUGHTON

**Appeal from the Circuit Court for Henderson County**
**No. 09-063-2     Donald H. Allen, Judge**

**No. W2010-01482-CCA-R3-CD - Filed June 30, 2011**

The Defendant, Carl Lee Houghton, was found guilty by a Henderson County Circuit Court jury of aggravated sexual battery, a Class B felony. See T.C.A. § 39-13-504(a)(4) (2010). He was sentenced as a Range I, standard offender to ten years' confinement in the Department of Correction. On appeal, he contends that (1) the evidence was insufficient to support his conviction, (2) the trial court erred by denying his motion to suppress his confession because it was not made voluntarily, and (3) the trial court erred in sentencing by not giving more weight to applicable mitigating factors. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Mike Mosier, Jackson, Tennessee, for the appellant, Carl Lee Houghton.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; James G. Woodall, District Attorney General; and Angela Scott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the Defendant and his step-granddaughter. At the trial, the victim testified that she was nine years old at the time of the trial. She and her siblings lived with her grandmother during the week, and the Defendant was married to her grandmother and lived in the same home. The victim said she referred to the Defendant as her "Pawpa."

The victim testified that in October 2008, she watched a video called "A Good Touch and a Bad Touch" at her elementary school and that afterwards, she told Ms. Christy that the Defendant had touched her a week earlier. She said that the Defendant touched her bottom and her chest over her clothes and that the touching made her feel bad. She said that the Defendant touched her in the bedroom she shared with her brother but that only she and the Defendant were in the room when he touched her. She said that the Defendant did not say anything when he touched her and that she did not say anything to him. She said that she did not wrestle with the Defendant and that she did not remember the Defendant's touching her on any other occasions. She said that after speaking with Ms. Christy, she spoke with women at the Carl Perkins Center. She said that because she was nervous, she told the women at the center that the Defendant did not touch her. She said she also told her mother that the Defendant did not touch her.

On cross-examination, the victim testified that she remembered the Defendant's removing ticks from the front of her leg in October 2008. She denied the Defendant removed ticks from her buttocks or from the back of her leg. She said she discussed her allegations against the Defendant with her mother, Ms. Christy, Investigator Crystal Pratt, and the prosecutor.

Henderson County Sheriff's Investigator Crystal Pratt testified that she worked primarily on child abuse and sex crimes. She was informed of the victim's allegations against the Defendant in October 2008. The first step in her investigation was to have the Carl Perkins Center perform a forensic interview with the victim. She said she observed a recording of the interview because the only persons allowed in the interview room were the victim and the interviewers. She said that during the interview, the victim denied the Defendant touched her.

Investigator Pratt testified that she contacted the Defendant on November 11, 2008, and that she met with him that day. She said the Defendant made a written statement in which he denied the victim's allegations. She said the Defendant stated that he wrestled with the victim and that if he ever touched the victim inappropriately, it was an accident. At the end of the interview, the Defendant agreed to return for a polygraph examination with the Tennessee Bureau of Investigation (TBI). She said the Defendant called her on November 14, 2008, and informed her that he recalled an incident when he removed a tick from the victim near her "private area."

Investigator Pratt testified that she arranged for TBI Agent Valerie Troutt to interview the Defendant and administer a polygraph examination on the morning of December 3, 2008. She said she was present when the Defendant signed a form consenting to the polygraph examination. She identified the form and said she signed the form as a witness. She

identified a second form signed by the Defendant titled, "Tennessee Bureau of Investigation Warnings as to Constitutional Rights," and said it informed the Defendant of his Miranda rights, including his right not to incriminate himself and his right to an attorney. She said she was present when the form was reviewed with the Defendant and signed by him. She said she left the room at approximately 9:45 a.m. after the Defendant signed the forms because standard procedure allowed only the Defendant and Agent Troutt to be in the interview room.

Investigator Pratt testified that she was called back to the room about one hour later. She identified a statement signed by the Defendant and said she was present when the Defendant made the statement and signed it. She said that Agent Troutt wrote the statement as the Defendant spoke but that the Defendant reviewed the statement and was allowed to make changes before he signed it. The statement was read to the jury:

> This is my voluntary statement given to Special Agent Valerie Troutt and Investigator Crystal Pratt. Valerie is writing my statement because I asked her to. I have not been coerced, threatened, or promised anything. I simply want to set the record straight and own what I did and explain what I did not do:
>
> I did touch [the victim's] butt approx. five times outside of her clothing at [my home] when I knew I had crossed the line and the touching became sexual in nature. I've never watched [the victim] undress, however, for any type of sexual satisfaction. If I touched [the victim's] vagina there was no sexual intent like when I touched [the victim's] butt. The touches of [the victim's] vagina were on top of her clothing. I'm glad [the victim] stood up for herself. The times I touched [the victim's] butt and it got out of hand (sexual, touchie-feelie) I knew around the third or fourth time I should not have touched her in that way. The sexual touching started around about September of this year. The touching always started out innocent. I don't know why it progressed to a sexual nature those five times. I'm sorry I did it and sorry I got caught. To make sure this never happens again I should not be around those kids. I think I deserve some jail time for this and I have learned my lesson. Amen. Carl Houghton.

Investigator Pratt said the statement was completed at 11:00 a.m. on December 3, 2008. She said that they allowed the Defendant to go home and that they arrested him the next morning.

On cross-examination, Investigator Pratt agreed that the Defendant voluntarily came to the Sheriff's department for his initial interview and for the polygraph examination. She said that she did not write down what the Defendant stated during their initial interview on November 11, 2008, but that the Defendant wrote his own statement denying the victim's allegations. Although the Henderson County Sheriff's Department had tape recording equipment, the interviews with the Defendant on November 11, 2008, and December 3, 2008, were not recorded. She said the department rarely recorded interviews.

Investigator Pratt testified that she was present when the Defendant gave his statement to Agent Troutt. She said she was absent from the interview room for about one hour and did not know what occurred in the room before the Defendant gave his statement. On redirect examination, Investigator Pratt testified that she and Agent Troutt heard the Defendant give his statement.

TBI Agent Valerie Troutt testified that she was the polygraph examiner for West Tennessee. On December 3, 2008, she prepared to administer a polygraph examination on the Defendant. She identified a form on which the Defendant consented to the polygraph and said she read the form to the Defendant before he signed it. The form provided that the Defendant had the right to have the polygraph examination recorded, but she said the Defendant did not exercise that right. She said TBI policy was not to record an examination unless a defendant requested the recording. She identified a form from which the Defendant was informed of his constitutional rights and said she read the form to the Defendant and had him read the waiver of his rights aloud before he signed it. She said the Defendant agreed to sign the form after being advised of his rights. She said Investigator Pratt was present when the Defendant signed the forms.

Agent Troutt testified that after the Defendant signed the forms, she explained to him that in order for the polygraph examination to be valid, the only persons allowed in the interview room were herself and the Defendant. She said that after Investigator Pratt left the room, she spent about thirty minutes asking the Defendant questions regarding his background and medical conditions that could affect the examination. She said she then asked the Defendant the reason why he was taking the polygraph examination and why he thought the victim lied. She said the Defendant "dropped his head" and "had an issue with saying that [the victim] lied." She said she then asked, "She's not lying, is she?" She said the Defendant replied, "No, she's not." She said that they then spoke of the victim's allegations in detail and that the Defendant explained what he did and did not do to the victim. She said she called Investigator Pratt back to the room and had the Defendant give a formal statement.

Agent Troutt identified the Defendant's signed statement and testified that she wrote the statement at the Defendant's request. She said that as the Defendant explained what he had done, she stated aloud what she wrote and asked him if the statement was accurate and whether he would change the content or the wording. She said she had the Defendant read the statement aloud, initial the first and last line, and sign the statement. She said the Defendant was remorseful as he gave the statement. She said she did not administer the polygraph because the Defendant confessed while she asked "pre-test" questions. She said the Defendant did not request another polygraph examination.

On cross-examination, Agent Troutt agreed that the Defendant met with her voluntarily but testified that she did not know whether the Defendant or Investigator Pratt requested the polygraph examination. She said that although she could have recorded the interview, she would not record an interview if a defendant stated that he or she did not want it recorded. She agreed a recording would have captured each word said during their conversation. Agent Troutt said that before the interview, she was informed that the victim told her guidance counselor the Defendant rubbed her breasts, vagina, and buttocks and that the Defendant denied the allegations in his initial interview with Investigator Pratt. She did not recall if she was informed that the victim denied the Defendant touched her when the victim spoke with persons at the Carl Perkins Center, but she agreed the victim's denial would have been important to know.

Agent Troutt testified that the Defendant was cooperative, polite, and "likeable" during the interview. She said that she asked preliminary questions to build a rapport with the Defendant and that the Defendant denied being treated for any medical condition, being in any current pain or discomfort, having been hospitalized within five years for any serious illness, or using any illegal drugs. She said the Defendant informed her that he and his wife did not have sex, that he had a problem ejaculating, that he was diagnosed with diabetes in 2004, and that he received a medical discharge from the military.

Agent Troutt testified that she did not know why the Defendant wanted her to write his statement for him. She said the written statement was a synopsis of what the Defendant said, but not verbatim. She said the Defendant determined what information went into the written statement. She said Investigator Pratt returned to the interview room about fifteen minutes before she wrote the Defendant's statement. On redirect examination, Agent Troutt testified that she and Investigator Pratt witnessed the Defendant give his statement.

The Defendant testified that he joined the Tennessee National Guard after completing high school and that he received a medical discharge because he had type II diabetes. He said he took medication to control his diabetes. He said that he lived with his wife and that their grandchildren, including the victim, lived with them during the week to facilitate the

children's school attendance. The victim and her siblings lived with their mother on the weekends. When asked to describe his relationship with his grandchildren, he said he was their "daddy." He said that the victim was eight years old in the fall of 2008 and that he never had any problems with her. He said that he previously touched the victim's buttocks to remove ticks but that the touching was not inappropriate and was the only time he ever touched the victim in that way.

The Defendant testified that he learned of the victim's allegations after speaking with Investigator Pratt on November 11, 2008. He said he voluntarily met with Investigator Pratt and told her the truth. He said he called Investigator Pratt a few days later because he recalled that he removed ticks from the victim. He said that he voluntarily met with Investigator Pratt and Agent Troutt on December 3, 2008, to take a polygraph and that he signed a form consenting to the polygraph examination. He said that he looked over the form but that he was not able to read well that morning due to his glaucoma. He agreed he also signed a waiver of his Miranda rights.

The Defendant testified that Investigator Pratt left the interview room and that although Agent Troutt was initially nice, her attitude changed suddenly and made the Defendant feel like he was guilty. He agreed that he spoke with Agent Troutt about the victim's allegations and that she wrote his statement. He said that the first thing he said when she started writing was, "What do you want me to say?" He said he did not tell Agent Troutt the truth because she made him feel guilty and he wanted to "get out of her office." He said that his eyes were "blurry" but that Agent Troutt read the statement to him. He said he signed the statement out of "stupidity" because he wanted "to get it over with." He said that although he told Agent Troutt he removed ticks from the victim, the statement did not contain that information. He did not recall telling Agent Troutt that he touched the victim sexually and said he never touched the victim with any type of sexual intent. He said the interview with Agent Troutt took fifteen to thirty minutes.

On cross-examination, the Defendant testified that when he spoke with Investigator Pratt, he denied the victim's allegations. He said that if he ever touched the victim, it was done accidentally while they were outside playing and wrestling. He said that although the victim testified that she did not wrestle with the Defendant, the victim may not have remembered playing in the yard. He agreed the victim testified that she remembered the Defendant's removing ticks from her body, that the incident with the ticks was not when the Defendant touched her inappropriately, and that the Defendant touched her while she wore night clothes. When asked if the victim was lying, the Defendant said, "I'm not calling her a liar."

The Defendant identified the written statement created during his interview with Agent Troutt and testified that the signature and initials on the statement appeared to be his own. He said he always signed his name, "Amen. Carl Houghton." He agreed he told Agent Troutt he touched the victim approximately five times in September 2008. He agreed Agent Troutt read the statement to him but said he gave a false statement. He said he told the truth during his first interview but lied during the second interview. He said he lied because he had not taken his medication and wanted to "get out of the place and try to get some medication for myself." He agreed Agent Troutt asked him if he had any reason he could not take the polygraph or tell the truth that day, and he said he told Agent Troutt he would do the best he could. He agreed he told Agent Troutt that he never watched the victim undress and that he never touched the victim anywhere other than on her buttocks.

Nathaniel Green testified that he was a clergyman with the Peace United Methodist Church. He said that he knew the Defendant through the church and that the Defendant was a truthful man. On cross-examination, Mr. Green testified that he had known the Defendant for about nine months and that he did not know the Defendant before the victim's allegations were made against the Defendant.

Upon this evidence, the jury found the Defendant guilty of aggravated sexual battery. He was sentenced as a Range I, standard offender to ten years' confinement in the Department of Correction. This appeal followed.

## I

The Defendant contends that the evidence was insufficient to support his conviction because the victim first reported the touching long after it occurred, the victim denied that the Defendant touched her when she spoke with persons at the Carl Perkins Center, he denied making the signed statement, and he offered a proper reason for touching the victim's buttocks when he stated he removed ticks from the victim. The State contends that the evidence was sufficient to support the Defendant's conviction. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As pertinent to this appeal, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant" when the victim is less than thirteen years of age. T.C.A. § 39-13-504(a)(4). Sexual contact is "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6) (2010).

Taken in the light most favorable to the State, the victim testified that in October 2008, she watched a video called "A Good Touch and a Bad Touch" at her elementary school and that afterwards, she told Ms. Christy that the Defendant touched her a week earlier. She said the Defendant touched her bottom and her chest over her clothes while she was in her bedroom. She said that because she was nervous, she told women at the Carl Perkins Center that the Defendant did not touch her. She remembered the Defendant's removing ticks from the front of her leg in October 2008 and said the ticks were not removed from her buttocks or the back of her leg. The Defendant signed a written statement in which he admitted to touching the victim's buttocks approximately five times in a sexual nature. Investigator Pratt and Agent Troutt testified that Agent Troutt read the statement to the Defendant and that the Defendant reviewed the statement and was allowed to make changes before he signed it. We conclude that a rational trier of fact could have found the elements of aggravated sexual battery beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

## II

The Defendant contends that the trial court erred by denying his motion to suppress his confession because it was not made voluntarily. He argues that his statement was not voluntary because he originally denied the allegations, because Agent Troutt made him feel guilty during their interview, and because he asked Agent Troutt, "What do you want me to say?" before he made the statement. The State contends that the trial court did not err because the Defendant's statement was made voluntarily and because the Defendant was informed of his constitutional rights and voluntarily waived those rights before making his statement. We conclude that the Defendant's statement was made voluntarily and that the trial court did not err by denying the Defendant's motion to suppress.

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." State v. Berry, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9). If a suspect is in custody and under state-initiated interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. See Miranda v. Arizona, 384 U.S. 436 (1966). Miranda warnings are not required in the absence of custodial interrogation. State v. Northern, 262 S.W.3d 741, 749 (Tenn.

2008) (citing Miranda, 384 U.S. at 478). In Miranda, the Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. See also Stansbury v. California, 511 U.S. 318, 323 (1994) (stating that when determining whether a subject was in custody, the ultimate inquiry is whether there was a formal arrest or a restraint on the person's freedom of movement of the degree associated with a formal arrest).

"The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (citing State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994)); see State v. Northern, 262 S.W.3d 741 (Tenn. 2008). For a confession to be considered voluntary, it must not be the product of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). The essential question, therefore, is "'whether the behavior of the State's law enforcement officials was such as to overbear [the Defendant's] will to resist and bring about confessions not freely self-determined . . . .'" State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)). The Supreme Court has held that in order for a confession to be involuntary, it must be the product of coercive state action. See, e.g., Colorado v. Connelly, 479 U.S. 157, 163-64 (1986).

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law, which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

At the hearing on the motion to suppress, the evidence regarding the Defendant's confession was similar to that presented at the trial. Investigator Pratt testified that she first met with the Defendant on November 11, 2008, and that the Defendant attended voluntarily and was not under arrest. She said that after the Defendant denied the victim's allegations,

she asked the Defendant to submit to a polygraph examination on December 3, 2008. She said that the Defendant voluntarily came to the polygraph examination and that he was not under arrest. She said she was present when the Defendant signed a form consenting to the polygraph examination and when Agent Troutt explained the form to the Defendant. She said she was present when Agent Troutt advised the Defendant of his constitutional rights and when the Defendant signed a written waiver of those rights. The forms were entered into evidence.

Investigator Pratt testified that she left the interview room for about one hour and that when she was called back to the room, she was told that Agent Troutt did not administer the polygraph examination because the Defendant confessed to touching the victim. She said she was present when the Defendant gave his written statement and signed it. She said Agent Troutt wrote the statement at the Defendant's request. The statement was entered into evidence. She said that the Defendant was not under arrest during the interview and that he was allowed to leave after he completed his statement. She said that she spoke with the prosecutor after the Defendant confessed and that the Defendant was arrested the next day.

On cross-examination, Investigator Pratt agreed that she left the interview room after the Defendant consented to the polygraph and waived his constitutional rights and that the Defendant signed the forms at 9:44 and 9:45 a.m. She agreed that the Defendant signed his written statement at 11:00 a.m. and that she was absent from the interview room for about one hour and fifteen minutes. She said that although the Henderson County Sheriff's Department had recording equipment, the Defendant's interview was not recorded. She agreed the Defendant denied the victim's allegations when he met with her on November 11, 2008.

Agent Troutt testified that she explained to the Defendant that he had the right to have his polygraph examination recorded but that the Defendant did not request a recording. She said she explained the Defendant's constitutional rights to him before Investigator Pratt left the interview room. She said a valid polygraph examination required all persons to leave the room except the examiner and the examinee. She said that after Investigator Pratt left the room, she asked the Defendant if he had any medical conditions that could affect the examination. She said she explained the victim's allegations and how a polygraph examination worked. She said that after she told the Defendant that the test could be affected by any unresolved issues he had or "anything weighing on him," the Defendant stated that he had done exactly what the victim alleged and that the polygraph examination was unnecessary. She said the Defendant told her what he had done and had not done to the victim. She said that she asked Investigator Pratt to return to the interview room and that she wrote the Defendant's statement after he asked her to write it for him. She said the

Defendant went over the statement "word-for-word," initialed it at the beginning and at the end, and signed the statement, "Amen. Carl Houghton."

On cross-examination, Agent Troutt testified that the times reflected on the polygraph consent form, the Miranda waiver, and the Defendant's statement were accurate. She said that it took about one hour and fifteen minutes to prepare the Defendant for the polygraph examination and that the Defendant stated he wanted to explain what happened before she began the polygraph examination. She said the Defendant admitted what he had done before Investigator Pratt returned to the interview room. She said the Defendant made his statement around 10:45 a.m., but she did not know the exact time. She said the written statement was an accurate representation of what the Defendant told her. She said it took her about ten minutes to write the Defendant's statement. She said that there was nothing unusual about how long it took the Defendant to read his statement and that she also read the statement to the Defendant.

Agent Troutt agreed that the statement did not include everything she discussed with the Defendant and said that she discussed many things with the Defendant, including his Gulf War experiences, his education, his work history, where he grew up, what medications he took, how many hours he slept the previous night, and what he ate for breakfast before the examination. She said the written statement only included what was "germane to the allegations." She said the Defendant informed her that he had not taken any medications or illegal drugs before the examination and that he drank three cups of coffee and ate twelve pieces of chicken for breakfast that morning.

Agent Troutt testified that she reviewed the case facts with Investigator Pratt before meeting with the Defendant and that she was aware the Defendant denied the victim's allegations during an interview on November 11, 2008. She did not know if the Defendant's initial denial was in writing and said she was not informed whether he made statements to anyone else. She said that during her interview with the Defendant, he was cooperative, genial, and appeared to be remorseful. She said the Defendant "completely" understood their discussion.

The trial court found that the Defendant voluntarily spoke with the officers on December 3, 2008, and that the Defendant was not under arrest and was free to leave the interview. The trial court denied the Defendant's motion to suppress after it concluded that the Defendant's statement was given freely, voluntarily, and without any type of coercion.

The record reflects that the Defendant voluntarily met with Investigator Pratt and Agent Troutt on December 3, 2008. He was not under arrest and left the sheriff's department after he gave his statement. Because the Defendant was not in custody or otherwise deprived

of his freedom of action in any significant way when he gave his statement, Miranda warnings were not required. See Northern, 262 S.W.3d at 749. In any event, the Defendant was informed of his constitutional rights and signed a written waiver of his rights before giving his statement. Furthermore, nothing in the record suggests that the Defendant was threatened, improperly influenced, or promised anything in exchange for his statement. Agent Troutt testified that she explained the victim's allegations to the Defendant and that they discussed the Defendant's background and medical history for about one hour before he confessed. The Defendant's statement notes that it was voluntarily made and that the Defendant was not "coerced, threatened, or promised anything." The statement was read to the Defendant, and he was permitted to make changes before he initialed it twice and signed it. We agree with the trial court's conclusion that the Defendant's statement was made voluntarily, and we conclude that the trial court did not err by denying the Defendant's motion to suppress. The Defendant is not entitled to relief on this issue.

**III**

The Defendant contends that the trial court erred in sentencing by not giving more weight to applicable mitigating factors. The State contends that the trial court properly sentenced the Defendant and that the weighing of enhancement and mitigating factors is left to the discretion of the trial court. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and

balanced in determining the sentence.  State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment.  T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210.  From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'"  Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

At the sentencing hearing, the State introduced the Defendant's presentence report. No testimony was presented.  The trial court found that the following enhancement factors applied:  (1) the Defendant had a history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, and (14) the Defendant abused a position of private trust in a manner that significantly facilitated the commission or the fulfillment of the offense.  See T.C.A. § 40-35-114 (2010).  The trial court found that the following mitigating factors applied:  (13) the Defendant was forty-seven years old, served

in the military, and did not have a substantial criminal history other than misdemeanor convictions for driving under the influence and violating the bad check law. See T.C.A. § 40-35-113 (2010). The trial court gave "moderate" weight to enhancement factor (1) and mitigating factor (13) and sentenced the Defendant as a Range I, standard offender to ten years' confinement in the Department of Correction.

Although the Defendant claims that the trial court erred by not giving more weight to applicable mitigating factors, the 2005 amendments to the 1989 Sentencing Act "deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." Carter, 254 S.W.3d at 344. The record reflects that the trial court imposed a sentence within the applicable range that was consistent with the purposes and principles of the Sentencing Act. The Defendant is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE